IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Criminal No.: 2:20-cr-20237-TLP |
| ) | |
| ) | |
| DERRION GOODS, ) | |
| ) | |
| Defendant. ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

**COMES NOW**, the United States, by and through Acting United States Attorney Joseph C. Murphy, Jr., and Assistant United States Attorney, Michelle Kimbril-Parks, and files this response to Defendant Derrion Goods's ("Goods") Motion to Suppress, which was filed on March 11, 2021.  RE-19, Motion to Suppress.  For the reasons stated below, Goods's motion is without merit and should be denied.

**I.     FACTUAL BACKGROUND**

On January 18, 2020, at approximately 7:00 P.M., detectives with the Memphis Police Department ("MPD") Multi-Agency Gang Unit were in the area of Mount Moriah and Mendenhall.  This area of Memphis is known to be a high crime area. Detectives Mills and Murphy observed a black sedan backed into a parking space directly in front of the door of the Eden Food Mart convenience store at 2799 South Mendenhall.  The car's engine was running, the sedan's headlights were on, and a person was seated in the driver's seat with his head down.  The detective's headlights shining through the sedan's windshield did not elicit any response or

movement from the driver.

Believing the driver to be unconscious, the two detectives walked up to the front driver's and passenger's side windows to perform a welfare check. While their body cameras were on, the microphones were not activated, nor did they have their guns drawn. The driver did not move or respond until the detective on the passenger's side knocked on the window with his right hand. The driver of the sedan at this point responded by looking up to see the detective. The driver then acknowledged the presence of the detectives while reaching his right hand down between the console and the driver's seat.

The two detectives swiftly pulled their service revolvers for their safety, simultaneously giving verbal commands to the driver to stop reaching between the console and the seat. The driver initially refused to cooperate with the detectives and continued reaching down, but eventually brought his hands up. When the driver finally complied with the request, he was removed from the vehicle, frisked, and detained by Detective Mills. While the driver was being moved a safe distance away from the vehicle and into one of the patrol cars, a black Glock handgun was seen in plain view where the driver had been reaching. The handgun was secured by one of the detectives on the scene; an inquiry into the gun showed that it was reported stolen as of November 2017 by the Mount Juliet Police Department.

Furthermore, when the door to the vehicle was opened during the removal of the driver, an odor of marijuana emanated from the vehicle. A trained K-9 officer was on the scene, and the dog alerted to a blue bag which had been on the driver's side floorboard at the time of the detention. The blue bag was searched, and a clear baggie of marijuana was found in it with a field weight of 23 grams.

After the loaded gun and the marijuana were found, the rest of the car was searched. A

black digital scale was found in a compartment near the radio.  Two unloaded AR 15 magazines and an extended Glock magazine with seven live rounds were found in the glovebox.

The driver was identified as Derrion Goods.  The officers were provided with information that he was on federal supervised release at the time of his detention.  Prior to his transport to jail and while still in the parking lot of the convenience store, Goods made an unsolicited statement that the Glock wasn't his and that he was just moving it.  He refused to sign a waiver of rights form concerning the firearm recovered from his vehicle.

**II.    LAW AND ARGUMENT**

In the aforementioned Motion, Goods presents the following arguments in favor of suppression:  1) there was not reasonable suspicion to support the *Terry* stop initiated by the detectives and 2) the investigative detention and inquiry into Goods was unconstitutional and unwarranted.  The Government disagrees with the Defendant on these claims.

The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Searches performed without a warrant are "per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  The Fourth Amendment's requirement of probable cause and a warrant is, however, subject "to a few specifically established and well-delineated exceptions." *Id.*  There are three types of reasonable, and thus, permissible, warrantless encounters between police and citizens:  (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever, and the citizen is briefly asked questions; (2) a temporary, involuntary detention, which must be predicated upon "reasonable suspicion;" and (3) arrest which must be based upon "probable cause." *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) (quoting *United*

*States v. Bueno*, 21 F3d. 120, 123 (6th Cir. 1994)).

In this case, there are several exceptions that are applicable to the situation before the Court. (1) the detectives had reason to engage in a welfare check on Goods based on his positioning in the running car; (2) there was reasonable suspicion for the detectives to conduct a *Terry* stop; (3) the firearm was subject to seizure to ensure officer safety; (4) the search of the vehicle fell under the exception to the warrant requirement as a search incident to arrest; and (5) there was probable cause for the search of Goods's automobile under the automobile exception to the warrant requirement. Further, the statements made by Goods while he was detained were unsolicited statements, and their exclusion is not warranted under *Miranda*. Alternatively, if none of the exceptions are found to be applicable, the Government's position would be that suppression of the evidence should not be the remedy chosen by the Court in this situation.

A. **Officers were permitted to approach the car to perform a welfare check pursuant to the community caretaking function, thus were lawfully in position to see items in plain view**

As noted in *Cady v. Dombrowski*, "[l]ocal police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. 433, 441 (1973). The ruling in *Cady* carved out an exception to the Fourth Amendment's warrant requirement for community caretaking functions and also acknowledged that there are many cases where there was a "constitutional difference between searches of and seizures from houses and similar structures and from vehicles" stemming "both from the ambulatory character of the latter and from the fact that extensive, and often noncriminal contact with automobiles will bring local officials in 'plain view' of evidence, fruits, or instrumentalities of a crime, or contraband." *Id.* at

4

442. The plain view doctrine is an exception to the Fourth Amendment which states that police may seize an article in plain view without a warrant in certain situations. *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). Plain view cases often involve a police officer who has a prior justification for an intrusion inadvertently discovering a piece of evidence that incriminates a person. *Id.* at 466. The doctrine serves to supplement the prior justification and permits the warrantless seizure. *Id.* If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy. *Horton v. California*, 496 U.S. 128, 133-34 (1990) (citing *Arizona v. Hicks*, 480 U.S. 321, 325 (1987)).

Further, the Sixth Circuit has noted that "'the community-caretaking exception is not limited to the least intrusive means of protecting the public.'" *United States v. Lewis*, 869 F.3d 460, 464 (6th Cir. 2017) (citing *United States v. Johnson*, 410 F.3d 137, 146 (4th Cir. 2005) (finding that the opening of a car door where a person was asleep inside was minimally intrusive and not requiring the officers to knock or attempt to speak through the window).

The community caretaking function has been found applicable in a variety of settings. *See United States v. Lewis*, No. 5:15-CR-20-KKC, 2015 WL 5198743, at *2–4 (E.D. Ky. Sept. 4, 2015), *aff'd in part*, 869 F.3d 460 (6th Cir. 2017) (where police were trying to ascertain whether a man sleeping in the passenger's seat of a car was capable of providing a safe ride home to someone visibly intoxicated); *United States v. Carr*, No. 07-10022-JDT, 2010 WL 11623324, at *1–4 (W.D. Tenn. Oct. 18, 2010), *aff'd*, 674 F.3d 570 (6th Cir. 2012) (police approached an vehicle in a car wash bay at night which was not being actively washed with no initial sign of occupancy).

A review of *United States v. Koger* also provides insight as to how the community caretaking function of police officers has been exercised in the field and reviewed by the Sixth Circuit and judges under its jurisdiction. 152 F. App'x 429 (6th Cir. 2005). In *Koger*, county

5

sheriff deputies were on patrol in a squad car when they noticed a running vehicle illegally stopped and partially blocking the road. *Id.* at 429-30. When law enforcement approached, they saw that the defendant appeared to be asleep or unconscious in the driver's seat. *Id.* at 430. After the defendant rolled down the window to speak to the deputies, there was a strong odor of marijuana. *Id.* Koger gave permission for a search of the vehicle, and, after being arrested, volunteered the information that everything in the car was his; this included thirteen bags of marijuana, a smoking pipe, baggies, digital scales, rolling papers, pills, and a handgun. *Id.* The district court adopted the magistrate judge's recommendations which included the conclusion that:

> even if the car had not been illegally parked or running at the time the deputies approached it, as a 'community caretaker' Deputy Phillips, after noticing a seemingly unconscious occupant parked late at night on a desolate stretch of road, had the authority, and perhaps the responsibility, to investigate by approaching the defendant's car under the reasonable fear that the apparently unconscious occupant was either in danger (perhaps hurt or ill), or was impaired such that upon awaking and driving, he could constitute a danger to others.

*Id.* This decision was affirmed by the Sixth Circuit Court of Appeals with no further detailed opinion. *Id.* at 431.

The situation here is very similar to that in *Koger*. While the vehicle was not illegally parked in front of the store, its engine was running, the headlights and radio were on, and the person in the driver's seat appeared to be unconscious. All of this occurred outside of a convenience store located in a high crime area at night. In an area with a high level of crime, it would be less likely that someone would come over to check on a person in distress as they would be equally worried about their own safety. Also, if the car had inadvertently been shifted into neutral, drive, or reverse by the apparently incapacitated driver, the sedan could have caused property damage and/or physical harm to the driver, the convenience store itself, and the staff and patrons of the convenience store.

Here, it was left to the detectives to take on the responsibility of ascertaining the condition of the driver under their community caretaking function. The detectives took the objectively reasonable steps of approaching the vehicle together to ascertain the condition of the driver and make sure of his well-being, without guns drawn. As in *Koger*, the decision to approach the car here was "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441.

Even if Goods was not unconscious at any point during these events, the detectives had no way of knowing that before approaching the car; in fact, Goods gave no sign of even being aware of their presence until they tapped on the window of the car. When Goods's immediate reaction was to start reaching for something between the console and the driver's seat, despite the detectives' warnings to stop, the detectives' safety became of paramount importance. The detectives drew their service weapons, and Goods was removed from the car which left the Glock between the console and the driver's seat and the odor of marijuana emanating from the car in plain view.

**B. Alternatively, there was reasonable suspicion to perform a *Terry* stop of Goods.**

Further, there was reasonable suspicion for a *Terry* stop to be performed with regard to Goods based on the detectives' reasonable and articulable suspicions that Goods had been involved in criminal activity.

In accordance with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley,* 29 F.3d 1073, 1075 (6th Cir.1994).

*United States v. Hurst* accurately summarizes the relevant law:

[A]n investigative detention is permissible when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity.... In reviewing a challenged investigative stop, "the totality of the circumstances—the whole picture—must be taken into account." ... Furthermore, "[i]n assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' "

228 F.3d at 757 (quotations omitted).

An officer who decides to conduct a *Terry* stop must be acting on more than his or her "inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry,* 392 U.S. at 27. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox,* 839 F.2d 285, 290 (6th Cir.1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

Finally, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The length of Goods's detention did not exceed the bounds of reasonableness, as the entire encounter lasted no more than thirty to forty-five minutes.

Here, the detectives had the reasonable suspicion needed to justify a *Terry* stop of Goods. To determine the constitutionality of a brief investigatory stop, we examine the "totality of the

circumstances" to determine whether a reasonable officer would have had a "particularized and objective basis" to suspect legal wrongdoing. *United States v. Carr*, 674 F.3d 570, 574–75 (6th Cir. 2012) (quoting *United States v. Brown,* 447 Fed.Appx. 706, 711 (6th Cir.2012)).

Here, Goods's vehicle was backed into a parking spot near the door to a convenience store at night in a high crime area. Additionally, the car motor was running; the sedan's headlights were on; and, despite a set of bright headlights beaming into the car, the driver's status could not be determined. The detectives could have easily and reasonably suspected from the facts (the positioning of the sedan facing away from the store, the running engine and activated headlights, its ability to flee at a moment's notice if a clear path was provided, and the unwillingness or inability of the driver to respond to the external stimulus of the police vehicle's headlights), and, based on their training and experience, that criminal activity was or soon would be afoot.

In fact, there were two options that would immediately come to mind to any reasonable officer – either Goods was in need of assistance and their responsibility was to help him or there was objective, reasonable suspicion to approach Goods and his vehicle to allay the suspicion of criminal activity. Parking one of the police vehicles to block Goods's vehicle from moving would in the first case, avoid collateral damage to other vehicles and people surrounding the situation, and, in the second, effectuate a *Terry* stop.

The defendant relies on the cases of *United States v. Gross* and *United States v. See* to support his conclusion that when his legally parked vehicle was blocked in the parking space by the MPD detectives, any consensual encounter for a welfare check was transformed into an unlawful seizure because the detectives lacked reasonable, articulable suspicion that criminal activity was being committed. R.E. 19, Motion to Suppress, PageID 24; *see also Gross*, 624 F.3d 309 (6th Cir. 2010); *See*, 574 F.3d 309 (6th Cir. 2009). It is important to note the differences

9

between these three cases.

The actions of the same Ohio officer were involved in the *Gross* and *See* cases; in each case, the officer pulled in behind a vehicle legally parked in a residential parking lot. *Id.* In the *Gross* case, the officer saw a legally parked vehicle with the engine running, no apparent driver, and a barely-visible passenger slumped down in the front seat who responded to the police spotlights by "sitting up abruptly and then slumping down further in his seat." *Gross*, 624 F.3d at 313-14. The officer stated at the suppression hearing that, at the time he left his police vehicle to perform a welfare check on Gross, he was not aware that there was any crime being committed; the Court responded that it was "readily apparent that, under the circumstances, Williams did not have a particularized and objective basis for suspecting Gross of criminal activity at the time of the stop." *Id.* at 316.

In the *See* case, the officer noticed a car backed into a parking space in a dimly lit area of a residential parking lot in a high-crime area in the early morning hours; the officer parked in front of See's vehicle to keep it from driving away so that he could conduct a *Terry* stop. *See*, 574 F.3d 309, 311-312. There was no mention of a concern for the welfare of the men in See's car. *Id.* The Court held that there was no reasonable suspicion because "[a]part from the contextual factors of time and the high-crime state of the area, all that Williams knew at the time he parked his car was that there were three men in an unlit car in the parking lot of a housing complex and that they had not chosen to park in one of the spots closer to the building." *Id.* at 314.

The scenarios in *Gross* and *See* are distinguishable from the situation at bar. First, in both *Gross* and *See*, the vehicles were legally parked in a residential parking lot; they were not pointed away from a convenience store open to the public with the motor running and the headlamps on in a position to easily facilitate criminal activity. Second, the reviewing Court in *Gross* and *See* found

10

that the officer involved in the comparison stops did not have any sort of articulable, reasonable suspicion that criminal activity was going on when the Terry stop was made. Third, unlike in *Gross*, Goods did not react to the stimulus of lights shining in his vehicle, and, instead, still seemed to be unconscious.

Furthermore, in light of the detectives's past law enforcement experience, these factors and circumstances along with the additional furtive movements made by Goods after the officers approached him while in the vehicle; his refusal to comply with the officers' requests to stop the movements; and the smell of marijuana coming from the car amounted to reasonable suspicion such that the scope of the initial stop could properly be expanded to a search of the vehicle. "Deliberately furtive actions" are proper factors to consider in assessing probable cause as noted by the Supreme Court. *Sibron v. New York,* 392 U.S. 40, 66–67 (1968). *See also United States v. McCraney,* 674 F.3d 614, 621 (6th Cir. 2012) (reiterating that the Sixth Circuit "has recognized that suspicious movements made in response to police presence may properly contribute to an officer's suspicions.") The officers' combined law enforcement experience, including years of investigating narcotics crimes, led them to reasonably believe that there was a fair probability that contraband or evidence of a crime would be found between the driver's seat and the console of the car. The probable cause standard "does not require that the officers *know* that evidence is contraband." *United States v. McLevain,* 310 F.3d 434, 441 (6th Cir.2002). Instead, "[i]t merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' that certain items may be contraband or stolen property or useful as evidence of a crime." *Id.* (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983)).

As noted in *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), a *Terry* stop permits law enforcement to "detain [a] person briefly in order to 'investigate

the *circumstances that provoke suspicion.*' " *Id.* (quoting *United States v. Brignoni–Ponce,* 422 U.S. 873, 881, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)) (emphasis added). "[W]hen a law enforcement officer no longer has any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave." *United States v. Erwin,* 155 F.3d 818, 823 (6th Cir.1998) (*en banc*). Clearly, the actions that Goods engaged in when the officers approached him did not end the detectives' reasonable suspicion of Goods's criminal activity, but instead added to the suspicion. "To have simply sent [Goods] on his way, without brief further questioning at the very least, would have been plainly unreasonable, even inept, police work." *Id.*

As the search was the result of a valid and lawful *Terry* stop, when the detectives were aware of the smell of marijuana coming from Goods's sedan, this also provided them with probable cause to search the vehicle without a search warrant. *See United States v. Foster*, 376 F.3d 577, 581-88 (6th Cir. 2004); *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993); *see also United States v. Elkins,* 300 F.3d 638, 659 (6th Cir. 2002). As a result, because the detectives had probable cause to search the vehicle, the marijuana, gun, ammunition, and digital scale recovered from the vehicle should be properly admissible against Goods and the motion to suppress should be denied.

**C. The seizure of the handgun was appropriate to ensure officer safety**

The Sixth Circuit has held that "a police officer who discovers a weapon in plain view may at least temporarily seize that weapon if a reasonable officer would believe, based on specific and articulable facts, that the weapon poses an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 629 (6th Cir. 2003). The seizure of a firearm must be found "reasonable in light of the totality of circumstances." *Id*.

The firearm here was obviously accessible to Goods and its whereabouts well known to him; he was reaching for it at the time that the officers had approached him to inquire as to his

12

well-being. The motions that Goods was making and his initial refusal to cooperate with the detectives' demands to stop making them raised further suspicions in the minds of the officers to the point that they had to remove Goods from the car. Any reasonable officer would believe, based on the circumstances outlined throughout this response that the weapon posed an immediate threat to both the safety of the detectives and the public; the firearm found in plain view was thus subject to temporary seizure. When it was discovered that Goods was under federal supervised release, the firearm became evidence of a crime and subject to seizure on that basis as well.

It should also be noted that the gun found in the car was loaded. The Sixth Circuit has ruled that "because the transportation of a loaded handgun is illegal in Tennessee", the gun in question becomes contraband and is subject to permanent seizure. *Id.* at 629.

### D. The searches of Goods's vehicle and person were also justified as searches incident to arrest

There was probable cause for Goods's arrest after the officers saw the loaded firearm in the vehicle in plain view and after the smell of marijuana led to the discovery of the substance in the vehicle, both under the terms of his supervised release and due to his then-current possession of a controlled substance. As noted in *United States v. Robinson*,

> "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

414 U.S. 218, 235 (1973).

Additionally, the Supreme Court held in *Arizona v. Gant* that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence

13

relevant to the crime of arrest might be found in the vehicle.' " 556 U.S. 332, at 343 (2009) (quoting *Thornton v. United States,* 541 U.S. 615, at 632 (2004) (SCALIA, J., concurring in judgment). Further, "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross,* 456 U.S. 798, 820–821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." *Id.* at 347.

In *Thornton*, an officer in an unmarked car saw the defendant slowing down to avoid driving next to the officer. 541 U.S. at 617 (2004). The defendant had pulled into a parking lot, parked the vehicle, and had gotten out of the car before the officer stopped him. *Id.* at 618. The officer accosted the defendant, asked him for his driver's license, and informed him that the tags on his car did not match the make and model of the vehicle he was driving. *Id.* After a pat-down, the officer asked the defendant if he had any narcotics on him, and the defendant produced what he had in his pockets. *Id.* At this point, the defendant was arrested, and a search incident to his arrest was conducted of his vehicle which revealed a handgun. *Id.*

Here, when Goods saw the officers, he instantly started reaching for an object between his seat and the console of the car. He was removed from the car for officer safety and a firearm was seen in plain view; it was confirmed that he was on supervised release and was not permitted to carry a firearm. The scent of marijuana was also present; its location was confirmed in a bag that had been on the driver's side floorboard of the vehicle. At this point, Goods was subject to arrest.

Based on Goods's behavior and the verification of the fact that he had violated the law, it was "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Thornton,* 541 U.S. at 632. As the search of Goods's vehicle was lawful, the firearm, scale, marijuana, and ammunition from the vehicle should not be suppressed.

### E. The automobile exception to the Fourth Amendment's warrant requirement applied to the search of Goods's vehicle

Under the automobile exception to the warrant requirement of the Fourth Amendment, an officer may perform a warrantless search of a vehicle if the officer has probable cause to believe that the vehicle contains contraband or evidence of criminal activity. *Smith v. Thornburg,* 136 F.3d 1070, 1074-75 (6th Cir. 1998); *see also Maryland v. Dyson,* 527 U.S. 465, 466-67 (1999) (citing *Carroll v. United States*, 267 U.S. 132, 153 (1925)). Probable cause "exists when there is a fair probability that contraband or evidence or evidence of a crime will be found in a particular place." *Thornburg*, 136 F.3d at 1074 (citations omitted). The "'automobile exception' has no separate exigency requirement," in that, "where there was probable cause to search a vehicle, 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'" *Dyson*, 527 U.S. at 466-67 (quoting *Ross*, 456 U.S. at 809 (1982)). As the Sixth Circuit explained in *United States v. Smith*, 510 F.3d 641 (6th Cir. 2007), "'[e]ven in cases where the automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.'" *Id.* at 647 (quoting *California v. Carney*, 471 U.S. 386, 391 (1985)). The court's determination whether there was probable cause at the time of the search is a "'commonsense, practical question' to be judged from the 'totality-of-the-circumstances.'" *Id.* (quoting *Thornburg*, 136 F.3d at 1074-75).

The totality of the circumstances here shows that when the officers approached Goods:

1. he engaged in movements which suggested that he was hiding contraband or reaching for a weapon;

2. a firearm was later located in plain view between the driver's seat and the console in the place where Goods was reaching;

3. the vehicle emitted the smell of marijuana; and

4. a canine alerted to a cache of marijuana in a bag which had been under the driver's side

seat in the car.

Viewing all the circumstances described above, this provided probable cause to search the vehicle without a search warrant. *See Foster*, 376 F.3d at 588; *Garza,* 10 F.3d 1241, 1246; *see also Elkins,* 300 F.3d 638, 659. Because there was probable cause to search the vehicle, the marijuana, gun, ammunition, and drug paraphernalia recovered from the vehicle should be properly admissible against Goods, and the motion to suppress should be denied.

**F. The unsolicited statements made by Goods while being detained should not be suppressed**

An individual is protected from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend V. This constitutional right "serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves" *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). This "is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.* at 460 (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)). *Miranda* applies to the custodial interrogation of a defendant, specifically questioning initiated by law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444.

Accordingly, *Miranda* does not prohibit the admissibility of any and all statements provided to the police from persons in custody; specifically, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id.* at 478. And "not … all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980).

To determine if *Miranda* applies, it must be determined if the suspect in custody was subjected to interrogation as "the special procedural safeguards outlined in Miranda are required

16

not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation," and interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Innis*, 446 U.S. at 300.

Spontaneous statements made by a defendant in custody, not in response to interrogation, are voluntary statements "admissible even though no *Miranda* warning has been given." *United States v. Starks*, No. 95-4105, 1997 WL 271744, at *2 (6th Cir. May 21, 1997). *See also United States v. Booker*, No. 92-5174, 1992 U.S. App. LEXIS 29028, at *12-13, 1992 WL 322241 (6th Cir. Nov. 5, 1992) ("*Miranda* warning requirements do not apply to a spontaneous and voluntary utterance which is made under no compulsion to speak"); *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir. 1997) ("where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of *Miranda* warnings"). A defendant who "seeks suppression of his statements based upon a failure to receive his *Miranda* warnings... must demonstrate by a preponderance of the evidence ... that he was entitled to receive them; *i.e.*, that he was subjected to a 'custodial interrogation.'" *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 22-2135, 1989 U.S. App. LEXIS 19087, at *15, 1989 WL 153161 (6th Cir. Dec. 18, 1989).

Here, the defendant has not met his burden to prove that he was subjected to a custodial interrogation by the detectives without the benefit of his *Miranda* warnings. First, the initial questions asked by the officers related to what Goods was reaching for were related to the public safety exception of *Miranda*. The "public safety exception" applies, and *Miranda*-less interrogation is permitted, "when officers have a reasonable belief based on articulable facts that they are in danger," which is an objective determination. *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001). The Sixth Circuit utilizes a two-pronged inquiry to evaluate the reasonableness

17

of an officer's belief that he or the public is in danger: The officer must have reason to believe (1) "that the defendant might have (or recently have had) a weapon," and (2) "that someone other than police might gain access to the weapon and inflict harm with it." *United States v. Reese*, 509 Fed.Appx. 494, 501–02 (6th Cir. 2012) (quoting *Talley*, 275 F.3d at 563). Thus, "[t]he public safety exception is applied if and only if both of those two conditions are satisfied and no other context-specific evidence rebuts the inference that the officer reasonably could have perceived a threat to public safety." *Id.*  As noted above, Goods was reaching for something between the driver's seat and the console just before he exited the vehicle.  The loaded weapon was shortly thereafter found in plain view, and ammunition that fit a different firearm was found in the glovebox, though that that particular weapon was not found.  Goods had a passenger in the vehicle with him who potentially would have access to any other weapons still in the car, especially after the car was released to her custody.  The officers thus had a reasonable belief that they and the public could have been in danger from an unsecured firearm and questions related to the search for the firearm were permitted without *Miranda* warnings.

Second, "[q]uestions posed 'to secure the personal history data necessary to complete the booking process, are exempt from *Miranda*'s coverage.' " *United States v. Broadus*, 7 F.3d 460, 464 (6th Cir. 1993) (quoting *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993)). Unless it appears that the officer used biographical questions to provoke an incriminating response, this type of routine questioning is not interrogation. *Id.*; *see also United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) (noting that the location and nature of the questioning, as well as whether or not the officer records the information given, are all relevant to whether the booking exception applies).  While Goods was also asked for information about his personal identifying information, this request for routine booking information was not interrogation.

18

Third, any other statements that Goods made were voluntarily made. He repeatedly asked the detectives what he had done. The detectives made brief, sparse answers to Goods (mainly emphasizing that Goods's actions in the vehicle had put Goods in danger of being shot) and mentioned that they would discuss what the charges were later. However, Goods continually responded by continuing to try to engage the officers in conversation despite the detectives' obvious reluctance to do so in the parking lot of the convenience store. During one of these brief interactions, Goods made the unsolicited statement that the gun wasn't his and that he was just moving it. This does not fit the definition of custodial interrogation and the statements made by Goods should not be suppressed.

**G. Even if a violation of Goods's Fourth Amendment rights is found to have occurred, suppression of the evidence is not warranted in this matter.**

Even if the Court finds that the incident described above was a *Terry* stop unsupported by reasonable suspicion, suppression of the evidence here is not warranted. As noted by the Supreme Court, "suppression is not an automatic consequence of a Fourth Amendment violation. Instead, the question turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct." *Herring v. United States*, 129 S. Ct. 695, 698 (2009).

The Supreme Court went on to say that "exclusion 'has always been our last resort, not our first impulse.'" *Id.* at 700 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). It has "never [been] suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence." *Id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 368 (1998)). It has also been noted that "to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial societal costs exacted by the exclusionary rule.'" *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)).

19

The conduct of the detectives here is not the type of conduct that warrants deterrence. They saw a man who was apparently unconscious and unresponsive to external stimuli in the driver's seat of a running vehicle at a convenience store open to the public in a high-crime area at night. They approached the man without guns drawn to see if he needed their assistance. To apply the exclusionary rule in this case would only serve to deter police officers from approaching stopped vehicles to engage in a community caretaking function. *See United States v. Carr*, 355 F. App'x 943, 951 (6th Cir. (THAPAR, A, dissent) ("We are going to say that if you approach to help someone, we will suppress the evidence if you happen upon activity of crime."). The evidence should thus not be suppressed.

### III.   CONCLUSION

For the aforementioned reasons, the United States respectfully submits that the Defendant's motion to suppress should be denied.

Respectfully submitted this the 23rd day of March, 2021.

JOSEPH C. MURPHY, JR.
Acting United States Attorney

/s/*Michelle Kimbril-Parks*
MICHELLE KIMBRIL-PARKS
Assistant United States Attorney

### CERTIFICATE OF SERVICE

I, Michelle Kimbril-Parks, Assistant United States Attorney for the Western District of Tennessee, hereby certify that a copy of the foregoing Motion has been forwarded to defense counsel via the district court's electronic filing system.

This date: March 23, 2021

By:   /s/*Michelle Kimbril-Parks*
MICHELLE KIMBRIL-PARKS