## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:20-cv-20237-TLP-1 |
| v. | ) | |
| | ) | |
| DERRION GOODS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

Defendant Derrion Goods moves to suppress evidence that Memphis Police Department's ("MPD") Multi-Agency Gang Unit ("MGU") recovered from his vehicle after an encounter in January 2020. (ECF No. 19.) And the Government responded. (ECF No. 22.) The Court held an evidentiary hearing. For the reasons below, the Court **GRANTS** Defendant's Motion to Suppress.

## BACKGROUND AND TESTIMONY

In his motion, Defendant claims that the MGU Detectives conducted an unconstitutional *Terry* stop, because they had no reasonable suspicion of criminal activity. (ECF No. 21.) According to Defendant, the unlawful stop amounted to a seizure which then led to an unlawful search and seizure of evidence. (*Id.*) Defendant asserts that he had parked in front of Eden Food Mart in Memphis, Tennessee when two detectives approached his vehicle, pulled him out of his car, and handcuffed him. (*Id.*) Defendant claims the Detectives unconstitutionally searched his car and recovered a gun, marijuana, a digital scale, and rifle magazines. (*Id.*) Defendant argues that this Court must suppress the evidence as fruit of an unlawful seizure and search. (*Id.*)

1

The Government counters that the Detectives were performing a welfare check on Defendant, and in any event, they also had reasonable suspicion to conduct a *Terry* stop.  (ECF No. 22.)

During the evidentiary hearing, the Government called as witnesses the two arresting officers—Detectives Cody Mills ("Mills") and Chris Murphy ("Murphy") from the MGU.  Both parties also showed video excerpts from the Detectives' body cameras.  The Court will summarize the testimony and the video evidence below.

## I.    Summary of Detectives Mills and Murphy's Testimony

Mills and Murphy are both experienced members of Memphis's MGU, which targets violent gang activity in the city.  As MGU officers, MPD assigns Mills and Murphy to different precincts, as needed, to assist uniform patrol officers by conducting "proactive policing."  The MGU seeks to address rising criminal activity through a targeted effort.  Murphy and Mills are patrol partners, but they drive separate cars.  On January 18, 2020, the two were working the evening shift near the Mount Moriah precinct in Memphis.

Both Detectives explained that MGU assigned them to Mount Moriah, because that area has had problems with robberies.  And at the time, Mount Moriah had experienced a recent spike in crime.[1]  Mills explained that local uniform patrol officers in the Mount Moriah area needed assistance from MGU.  Both Officers repeatedly referred to Mount Moriah as a "high-crime" zone.

---

[1] The Government introduced a chart with statistics showing the changes in criminal activity from 2018 to 2019 in the Mt. Moriah precinct.  Seemingly the Government intended to bolster the premise that this was a high crime area and that the criminal activity was on the rise.  But the chart tells a different story.  For example, according to the Government's chart, business robberies from 2018 to 2019 dropped by 63.8% and robberies of persons fell by over 31%.  (ECF No. 24, Ex. 1).  The chart lacks any statistics for drug trafficking in the area.

Both Detectives also testified that they were driving close to each other on Mendenhall Road, when they observed a car parked at Eden Food Mart, a convenience store, and gas station that sells Shell gasoline. The Eden Food Mart also served food made to order. The car was backed into a parking spot near the front door of the store with its headlights on. Both Detectives testified that it was about 7:00 p.m. at night and the parking lot was dark.

Based on his experience, Mills stated that the car's position immediately made him suspicious. Because the vehicle was backed into the parking spot, running[2] with its headlights on, the car looked to him as if the driver could make a quick escape from a drug deal or robbery. Mills explained that gas stations are high crime areas and that in his experience, drugs are often sold at gas stations. Plus, he knew there had also been many robberies in the Mount Moriah area.

Similarly, Murphy testified that when he saw the car backed in near the front door of the store, it made him immediately suspicious of criminal activity. While both Detectives testified that they were suspicious, they also testified that Defendant had parked his car legally and that they observed no actual criminal activity.

Deciding to investigate the situation, the Detectives pulled into the store's parking lot with Murphy leading. Both officers testified that Detective Murphy pulled directly in front of the "suspicious" vehicle and parked. Detective Mills stopped next to Murphy's vehicle at an angle close to the front and to the right of the driver's side of Defendant's car.

---

[2] Mills described Defendant's car as running when he explained that he noticed the car as he was driving by the Eden Food Mart. As it turns out, the car's engine was running. But the Officers could not have known the car was running until they got out of their cars and walked up to it. This is not a huge point but the Government relies on the running car as a basis for the Officers' decision to pull onto the store parking lot. This Court finds that the Officers learned about the engine after they got out of their cars, not before.

3

Both Detectives claimed that when their headlights lit the suspicious car, they observed Defendant's silhouette slouched over in the car. Again though, both Mills and Murphy testified that, although they were suspicious, they saw no evidence of criminal activity. And the Detectives both admitted that they spent no additional time surveilling the situation before acting. Instead, they pulled directly onto the lot, parked in front of Defendant's car, and approached the vehicle on foot.

Both Detectives testified that soon after they started the encounter, another MGU officer pulled up as well, although neither Detective remembered exactly when that happened.

After the Detectives saw Defendant slumped in the driver's seat, they claim they became concerned about him. Murphy testified that they could see Defendant through his front windshield, and he appeared to be unconscious. Because Murphy parked in front of Defendant, his headlights were shining into Defendant's car. And according to the Detectives, because Defendant did not respond to their lights, they grew more concerned. The Detectives both testified that while they were at first suspicious of the way the car was parked, they quickly became concerned about Defendant's well-being when they saw inside the car. For this reason, they wanted to perform a welfare check.

The Detectives stated that they approached the car on foot at the same time, with Murphy at the passenger-side window and Mills at the driver's side window. Mills explained that this is their procedure because it is safer for officers to approach both sides and stand behind the vehicle's front doors. This angle puts vehicle passengers at a disadvantage if they decide to shoot or attack.

Murphy testified that once he approached the car, he knocked on the passenger window and shined his flashlight into Defendant's car. Both Detectives explained that the car's windows

4

were tinted.  Murphy testified that he saw Defendant move.  And when he shined his flashlight

into the car, according to Murphy, Defendant looked up at him, as if startled.  Murphy described

Defendant as having a "deer in headlights" look.  Defendant then started reaching under the

driver's seat.  Murphy testified that he told Mills to get Defendant out of the car and away from

whatever he was reaching for.

From Mills' perspective, once he approached the driver's side window, he did not have a

clear view of the inside of the car, because the window tint was dark.  Mills stated that Murphy

gave off signals that something was "off" with the driver.  At that point, Mills testified that he

tapped on the driver's door, and Defendant did not respond.  Mills then opened the door to take

control of the situation.

Mills explained that he feared for his safety, so he pulled Defendant out of the vehicle

and moved him away from the door both to detain him and to eliminate any threats.  Mills

testified that the Officers identified Defendant later after they had controlled the situation.

Mills also testified that he noticed a bag in the floorboard of the driver's side and that

Murphy reached inside the car and threw the bag onto the passenger seat.  Neither Detective saw

any other passengers in the vehicle.

Both Detectives testified that at some point during the encounter Defendant's girlfriend

came out of the convenience store.  Mills testified that he did not speak or interact with her.

Murphy spoke with her, but she did not consent to search the car.  She said the car was her

boyfriend's.

According to his testimony, Mills smelled marijuana when he got Defendant out of the

car.  So he planned to use his K-9 (Mambo) to perform a drug sniff inside the car.  Mills testified

that he did not search Defendant's car at first.  Instead, Mills testified that he glanced into the car

and observed a pistol grip under the driver's seat.  He claims it was in plain view.  Mills also testified that he looked into the car to make the scene safe.   Mills testified that he did not search the car; instead, he said he was checking the vehicle to make sure there was nothing that would hurt his K-9 before it sniffed for drugs.

After Mills ran the dog inside the car, it alerted to the bag Murphy had moved from the driver's side floor to the passenger seat.  At that point, the officers performed a more thorough search of the car.  They then found and seized a handgun, marijuana, a digital scale, and rifle magazines.

Both Detectives testified that Defendant did not consent to a search of the car.  And the Detectives claimed that they did not ask Defendant any questions, but they did respond to him when he engaged them in conversation.  The Officers testified that they explained to Defendant how his actions caused the encounter.  Both Officers also testified that they did not read Defendant his *Miranda* rights.

The Detectives both wore body cameras that captured footage of the encounter.  The videos confirm parts of the Detective's testimony, but the videos also cast doubt on a few key points.  The Court will next summarize that footage.

## II.    Summary of Detective Mills and Murphy's Body Camera Footage

For background, the Officers testified that their body worn cameras have a setting in which the camera constantly records, but it does not always retain that footage unless they specifically engage the camera.  In a certain mode, when the officer engages the camera, it will go back and retrieve about 30 seconds or a minute of the earlier footage before the officer engaged the camera.  This allows the viewer to get more context for the recorded incident. When Murphy engaged his body camera here, it starts with him driving down Mendenhall Road

for about 26 seconds before turning onto the parking lot. Mills' video footage however did not begin until the moment that he started to take Defendant out of the car to detain him. And both videos begin without sound. In Murphy's video, the sound begins in about sixty seconds after the video starts. In Mills' case, the sound on his video starts in about 27 seconds.

Murphy's video begins with him driving on Mendenhall Road and making a left turn into the Eden Food Mart parking lot. And despite the Detectives' testimony that the parking lot was dark, the video shows that the parking lot was in fact well lit. There were lights on either side of the store, on the store front, and at the gas pumps.

The video also shows that Murphy stopped his patrol car right in front of Defendant's vehicle—nose-to-nose. Then, with no hesitation or pause, Murphy got out of his patrol car and approached Defendant's car. From the time Murphy turned off Mendenhall Road to the moment that he stood next to Defendant's car, only 25 seconds went by.

From Murphy's vantage point, the viewer can see that Mills parked his patrol car in front of Defendant's car, to the right of Murphy's. After Murphy was standing at the passenger side, he tapped on the window and immediately drew his gun. Although he is shining his light into the car, the window tint prevents the viewer from seeing what Murphy said he saw inside the car. At that point, there was no sound on the video, so it is unclear if he communicated anything to Mills, who was standing at the driver's side. Murphy then walked to the driver's side of the car. By that time, the video shows Mills had taken Defendant out of the car and started to pat him down and handcuff him.

Mills' body cam footage helps fill in the details here. It shows Mills pulling Defendant out of the vehicle, patting him down, and handcuffing him. Soon after, the video's sound started.

Once Mills handcuffed Defendant, Murphy asked Defendant what he was reaching for. Murphy asked Defendant whether he had anything in his car that should not be there.

By that time, other MGU officers arrived with one parking next to Murphy and Mills, which further blocked Defendant's vehicle. Mills then escorted Defendant to a patrol car and placed him in the back seat. As Mills put Defendant in the patrol car, he asked Defendant if they could search his car. Defendant shook his head no and said that the car belonged to his girlfriend.[3]

The body camera video shows that Mills immediately returned to Defendant's car, and through the open driver's side door, shined his flashlight inside the car. He then leaned into the car with his flashlight and looked under the driver's seat. He announced, "there's a pistol right there." He stepped back from the vehicle, aimed his flashlight through the windshield and said that the gun was in plain view. At that point, Murphy leaned into the car and said the gun was a "Glock."

Mills then entered the vehicle again and started to look through the glovebox and open what appeared to be bottles of medicine. Around that time, Murphy asked Mills if he planned to run Mambo, the drug detecting K-9. It was not until that point—after Mills had leaned inside Defendant's car for the second time—that he stated, "smells a little bit like weed." Mills then used his K-9 to search for drugs inside the car.

The video showed Mills then returning to speak with Defendant and to remove Defendant's keys from a key ring on his belt loop, so that Mills could open the trunk of

---

[3] The video also shows that in under 3 minutes after the Officers approached the car, Defendant's girlfriend walked out of the convenience store with a dark plastic bag in her hand. Murphy then briefly questioned her about the car. To the Court the plastic bag looked to contain items she bought inside the store.

Defendant's vehicle.  During this exchange, Defendant asked Mills about why the Officers had detained him.  In response, Mills said Defendant was acting suspiciously and started reaching. Mills then asked Defendant what he was trying to do with that pistol.  Defendant replied that he was trying to hide it.

The first issue for the Court is what happened at the beginning when the Detectives first pulled into the parking lot.  The Court will now consider whether the Detectives started a *Terry* stop.

## THE TERRY STOP

### I.  The Detectives Performed a *Terry* stop—Not a Welfare Check

The Court begins its analysis of this encounter when Detectives Murphy and Mills first pulled their vehicles in front of Defendant's car.  Murphy parked his car nose-to-nose with Defendant's car and Mills parked his car a bit to the right on the driver's side but also close to Defendant's car.  The rear of Defendant's car was against the curb in front of the store and Murphy's car was close to the front of the car.  The Officers' cars blocked Defendant's car.  This Court finds that a reasonable person in Defendant's position would not feel free to leave.

At this point, the Court faces one initial question—had the Detectives begun a *Terry* stop or a welfare check?  This question matters because if they performed a welfare check, the Detectives did not need any particular suspicion to approach Defendant's vehicle.  But if they began a *Terry* stop, they needed reasonable, articulable suspicion of criminal activity before blocking Defendant's car.  *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  Officers must have reasonable suspicion to ensure that when they conduct investigative stops, they do not violate a defendant's Fourth Amendment right to be free from unreasonable searches and seizures.  *See id.*

For *Terry* purposes, a person is "seized" when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). This happens when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554–55.

But unlike in *Terry* stops, local officers may engage in community caretaking functions that are "totally divorced from the detection, investigations, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Under the community caretaking doctrine, when police are fulfilling their community caretaker role (outside criminal law enforcement) and discover evidence of a crime, that evidence is admissible even if they discovered it without probable cause. *Id.* at 447–48. And so, when an officer performs a welfare check as a community caretaker, they should do so without the intent to investigate potential criminal activity.

The Government argues that the Detectives here acted as community caretakers and performed a welfare check, because they saw Defendant slumped over in the car when their headlights lit up Defendant's interior when they parked their cars. (ECF No. 22.) But Defendant relies on *United States v. Gross*, 662 F.3d 393 (6th Cir. 2011), to argue that this was in fact a *Terry* stop, instead of community caretaking. And the Court agrees that *Gross* applies here.

In *Gross*, the defendant parked legally outside an apartment complex in a high crime area. 662 F.3d at 396. An officer passing through the parking lot noticed a "barely-visible

passenger who was slumped down in the front-passenger seat of the vehicle." *Id.* The officer parked his vehicle directly behind the car and determined that the owner of the car had no outstanding warrants. *Id.*

Even so, the officer turned on his vehicle spotlights, and the passenger (the defendant) reacted to the lights by sitting up abruptly and then slumping back down. *Id.* at 396–97. The officer approached the car and asked the defendant several questions. *Id.* at 397. After identifying the defendant, the officer learned that he had an outstanding warrant, and officers eventually discovered a gun. *Id.*

The defendant and the Government in *Gross* presented arguments that are almost identical to the arguments here. In *Gross*, the defendant moved to suppress the evidence arguing the officer did not have reasonable, articulable suspicion of criminal activity. *Id.* at 399. And the Government argued that the officer was checking on the defendant in a community caretaking role. *Id.* But the Sixth Circuit disagreed with the Government. *Id.*

There, the Sixth Circuit explained that once the officer blocked the defendant's car, he began an investigatory *Terry* stop. *Id.* ("Gross is correct that when Officer Williams blocked the car in, he began an investigatory *Terry* stop.") And "because Officer Williams was unable to articulate a reasonable suspicion for the investigative stop, it constituted an unlawful seizure of Gross." *Id.* at 401.

*United States v. See* is also instructive. 574 F.3d 309 (6th Cir. 2009). There, the Sixth Circuit found that a police officer conducted a warrantless *Terry* seizure when the officer blocked the defendant's car to determine the identity of the vehicle occupants. *Id.* at 313. The Court found that because the officer blocked the defendant's car with a marked patrol car, "a reasonable person in [the defendant's] position would not have felt free to leave." *Id.*; *United*

*States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) ("[B]y blocking in the Nissan, the officers had communicated to a reasonable person occupying the Nissan that he or she was not free to drive away.").

Based on *Gross* and *See*, the case law is clear—once Detectives Mills and Murphy blocked Defendant's vehicle, he was no longer free to leave.  The *Terry* stop had started.

To continue to explain, the officers here immediately pulled into the convenience store parking lot and blocked Defendant's car with multiple cars.  Even if they became legitimately concerned about Defendant's health when they saw him slumped over, they did not see him until after their cars blocked Defendant's exit route.  Plus both Detectives testified that they first pulled into the parking lot, because the car looked suspicious to them.  As officers with MGU, these detectives performed "proactive policing" in the area.  When they saw Defendant's car parked backwards, they engaged with him.

But remember, a welfare check must be "totally divorced" from criminal law enforcement.  *Cady*, 413 U.S. at 441.  Any concerns the officers had for Defendant's well-being were not "totally divorced" from criminal law enforcement.  Instead, the Detectives no doubt wanted to investigate whether crime was "afoot."  (*See* ECF No. 22 at PageID 35.)  So from the moment the Detectives blocked Defendant's car, they had started a *Terry* stop requiring reasonable suspicion.

And while the Court believes the Detectives here were well-intentioned, this is not a hard call.  The Court finds that when they blocked Defendant's car with theirs, the Detectives started a *Terry* stop and not a welfare check.  Under *Terry*, anything that happened or that the Officers learned after they blocked in Defendant's car cannot justify their actions.

II.     **The Detectives Did Not Have Reasonable Suspicion**

This leads to a second important question.  Did the Detectives have a legitimate basis for beginning the *Terry* stop?  The Court finds they did not.

For starters, an officer may conduct a brief investigatory stop without a warrant if the officer has reasonable articulable suspicion that criminal activity has occurred or is about to occur.  *Terry*, 392 U.S. at 21–22.  The officer must be acting on more than an "inchoate and unparticularized suspicion or 'hunch,'" and must instead act on "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."  *Id.* at 27.

And courts evaluate reasonable suspicion under the totality of the circumstances.  In other words, considering the totality of circumstances, did the officer have a particularized and objective basis for suspecting that the person he stopped was engaging in criminal activity.  *Gross*, 662 F.3d at 399 (citing *United States v. Baldwin*, 114 Fed. App'x. 675, 679 (6th Cir. 2004)).  This standard requires more than a mere hunch.  *Id.*

So here, what information did the Detectives have when they first pulled into the parking lot and started the *Terry* stop?  They knew they were in a high-crime area at about 7:00 p.m.  And as they drove by a gas station/convenience store, they spotted a lone vehicle in the parking lot.  The video shows that, of the roughly six parking spaces in front of the store, Defendant's car was the only car parked in any of them.  Defendant parked legally but the car's headlights were on, and it was backed into a parking place near the front door of the convenience store.  Not until the Detectives pulled in front of the vehicle did they see Defendant slumped or notice that the car was running.

By their own admission, the Detectives observed no criminal activity and no signs of imminent criminal activity as they blocked Defendant's vehicle.  That a robber might also back

his car into a parking place for a quick getaway is of little value here. Aside from Defendant's legal method of parking, the Detectives could point to no other factors that they believed to be suspicious.

The Court finds that the Detectives, while well-intentioned, had a mere hunch. And even if the hunch turns out to be accurate, a hunch is not reasonable suspicion. *Terry*, 392 U.S. at 27. As in *Gross* and *See*, the Detectives here did not have a reasonable basis for suspecting Defendant of criminal activity.

*See* is especially helpful for the Court. There, the Sixth Circuit noted the officer's reasons for suspicion—(1) it was 4:30 a.m., (2) the officer saw the car parked in a high-crime area, (3) the officer had instructions to pay attention to non-resident loiterers due to recent robberies, (4) there were three men in the car, (5) the car's interior light was off, (6) the car was parked away from the apartment building in a dim area, and (7) the car did not have a front license plate. *See*, 574 F. 3d at 314. And yet all of these factors together did not sway the Court. *See id.*

Instead, the *See* court pointed out factors that the officer did *not* observe—the officer was not responding to a complaint, did not suspect the men of a specific crime, had not seen the men sitting in the car for a long time, was not acting on a tip, had not seen the men do anything suspicious, and the men did not try to flee. *Id.* Overall, the men there appeared to be engaged in legal activity. The Court summed up the situation stating that the officer "did not have reasonable suspicion that criminal activity was occurring, and the *Terry* stop was therefore improper." *Id.* So too here.

The circumstances in *See* strike this Court as much more suspicious than the totality of circumstances here. Defendant here parked legally in a well-lit, public parking place at a

convenience store in the early evening. The officers here took quick action to block his vehicle without the benefit of surveillance for any time. There is nothing illegal about backing one's car into a parking space. People do it all the time for any number of reasons—some criminal perhaps, but many innocent ones. And while the Detectives here had good instincts, Defendant's girlfriend walked out of the store with a bag in her hand less than 3 minutes after the officers arrived. It appears she just went inside to buy merchandise from the store—a benign activity.

Had they pulled their cars to the side of Defendant's or stopped short of blocking the car, perhaps the result here would be different. But the Court finds that the Detectives here did not have a reasonable basis to conduct this *Terry* stop. So the Detectives seized Defendant and searched his vehicle in violation of the Fourth Amendment.

Finally, the Court should address whether this unlawful *Terry* stop also means that the Court should suppress the evidence the Detectives found.

## EXCLUSIONARY RULE

Defendant asks the Court to suppress all evidence the Detectives found when they seized him—the gun, marijuana, scales, magazines, and his statements. (ECF No. 19.) And "[t]he fruit of the poisonous tree doctrine bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011). "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 485 (1963). In fact, under this doctrine, "all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a

product of the constitutional violation." *United States v. Darden*, 353 F. Supp. 3d 697, 720 (M.D. Tenn. 2018).

Again, this is not a hard question. The Detectives were only able to seize the evidence here because of their unlawful *Terry* stop. The evidence the officers seized is a classic example of fruit of the poisonous tree. And the Court finds that no exception like attenuation or inevitable discovery applies here either. *See See*, 574 F.3d at 315. Indeed, the Government does not even argue that an exception applies. (*See* ECF No. 22.)

Instead, the Government argues that suppression is not automatic after an officer violates a defendant's constitutional rights. (*Id.* at PageID 45–46.) The Government contends that the Court should consider the Detectives' actions and ask whether exclusion would deter wrongful police conduct. (*Id.*) The Government claims that to exclude this evidence would only deter officers "from approaching stopped vehicles to engage in a community caretaking function." (*Id.* at PageID 46.) But that is not the point here—the Detectives were not performing a welfare check. They had started the *Terry* stop before they ever noticed Defendant's slumped posture. So they needed *reasonable* suspicion before they ever parked in front of Defendant's car.

As the Court considers the Government's position on whether excluding the evidence here has any deterrent value, it is useful to review some of their testimony. For example, despite reaching into the car and moving a bag from the floor of the driver's side to the passenger seat, despite leaning into the car with flashlight in hand and looking throughout the passenger compartment, not once but twice, the Officers here each testified that they were not searching Defendant's vehicle. As he watched the video of Mills leaning into the car with his flashlight, Murphy testified that Mills was not searching Defendant's car but just "looking around." It is unclear what he meant by this. But the fact that he thinks there is a difference between looking

around and conducting a search is concerning. The video showed Detective Mills lean his upper torso into the driver's side of the car pointing his flashlight into the car. This was before he spotted the gun under the driver's seat. Make no mistake, that conduct by the officers is a search.

And Mills denied ever questioning Defendant after detaining him in the back seat of the police car. But, again, the video shows otherwise. With Defendant handcuffed and seated in the rear of a police car, after responding to Defendant's question about why officers approached him, Mills says, "What were you trying to do with that pistol?" To which Defendant says, "hide the m…f..er." This is not a close question. Under these circumstances, Mills should have given Defendant *Miranda* warnings before asking him about the gun.

And so, considering deterrent value here, the Court finds that this case presents a prime example of when the exclusionary rule should operate as designed. The Court's hope is that the detectives here understand that in the future, they must have *reasonable* suspicion before ever beginning an investigative *Terry* stop[4]. Otherwise, they run the risk of violating rights guaranteed by the Constitution. Again, the Court understands that the Detectives face hard decisions and dangerous encounters, but there are constitutional limitations to the type of proactive policing here.

For these reasons, this Court **ORDERS** the suppression of all evidence the officers uncovered in Defendant's car and Defendant's statements.

## <u>CONCLUSION</u>

All in all, the Detectives here practiced proactive policing too proactively. While their instincts were good, their execution violated the Constitution. In the end, the Detectives started a

---

[4] It would also be useful for them to review the requirements of *Miranda*.

*Terry* stop without reasonable suspicion.  For that reason, the Court **GRANTS** Defendant's

Motion to Suppress.

       **SO ORDERED**, this 6th day of May, 2021.

                                        s/Thomas L. Parker
                                      THOMAS L. PARKER
                                      UNITED STATES DISTRICT JUDGE